In the Matter of MORRIS DURST, an Attorney, Respondent.

First Department, February 14, 1930.

*Isidor J. Kresel* [*E. Crosby Kindleberger* with him on the brief], for the petitioners.

*Charles B. McLaughlin,* for the respondent.

DOWLING, P. J.   Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court, First Department, on July 2, 1903.

The petition charges, on information and belief, that the respondent has been guilty of misconduct as an attorney at law as follows:

Between January 1, 1927, and March 1, 1928, one Harry Hacker was employed as an adjuster by the Union Indemnity Company in the city of New York.   During the period stated the respondent herein authorized Hacker to use his name as attorney for persons in whose behalf claims had been made or were to be made for damages alleged to have been sustained by reason of personal injuries suffered by them in accidents due to the negligence of persons insured against damages by the said Union Indemnity Company.   During said period Hacker, using the name of the respondent as attorney for such claimants, induced the said company to settle the claims made as aforesaid by the payment of various sums of money and procured from the company and delivered to the respondent herein the checks given in settlement of said claims.   The respondent collected the proceeds of said checks and after retaining for his own use a part thereof returned to the said Hacker the balance thereof in the form of checks drawn to the order of the alleged claimants or to the order of persons who Hacker claimed had formerly acted as attorneys for said claimants. The respondent did not know and was never retained by any of the persons whose alleged claims were settled as above stated.   He did not render any service in their behalf or make any investigation regarding the merits of their alleged claims.   The claims made in their behalf were false and fictitious and without merit, as the respondent well knew or should have known.   The use of the respondent's name in the manner stated was part of a scheme or plan participated in by the respondent and the said Hacker to procure money from the Union Indemnity Company by false and

fraudulent representations to the effect that the persons whose claims were settled as above stated had been injured and damaged and that the respondent had been retained by them to act as their attorney and to collect the damages claimed in their behalf.

Respondent in his answer admits that he never knew any of the claimants nor rendered any services for such claimants, and alleges that Hacker took advantage of respondent's illness and represented to respondent that he had settled a number of cases for various attorneys for a consideration and that some of the attorneys refused to make good; that he requested respondent after a case had been settled to have respondent substituted as attorney with the consent of the attorney of record and his client, so that the checks for such settlement be made payable to respondent to insure payment to Hacker by the original attorney of record for services rendered by Hacker; that immediately upon receipt of settlement checks from the Union Indemnity Company, respondent was to and did draw checks for fifty per cent to the claimant, forty per cent to the original attorney of record, and was to and did retain ten per cent for his services in discounting such checks; that Hacker and the original attorney of record, by reason of respondent's nominal charge and their possession of all papers, were to attend to the proper substitution of respondent, and that respondent believed that such substitution had been properly attended to because Hacker brought to respondent checks of the Union Indemnity Company made to respondent's order as attorney for the claimants; that he did not know the nature of the claims until checks were presented to respondent on which the nature of the action was noted.

Respondent denies that he at any time knew that such claims were fictitious or without merit, or that they were used by him or Hacker as a scheme to procure moneys from the Union Indemnity Company; or that he knew what representations were made by Hacker to the Union Indemnity Company in order to effect such settlement, or that he knowingly participated in such scheme to effect such settlement; and denies that he ever permitted Hacker to use his name for any purpose other than to be substituted as aforesaid.

Respondent contends that when he consented to be substituted as attorney at the nominal charge of ten per cent, he looked at it as a pure and simple business transaction of discounting checks; that he at no time suspected that Hacker was deceiving him and scheming to procure moneys from the Union Indemnity Company, or that the checks which he gave Hacker would be diverted from their proper channels, as was subsequently shown; that respondent knew Hacker to have had a very responsible position in the law department

of the Union Indemnity Company for a period of over ten years, and the thought of Hacker misusing the checks never dawned upon his mind; that he did not lend his name to Hacker for settlement purposes, but was to be substituted as attorney after such settlement for the purpose of discounting the checks and to insure payment to Hacker by the original attorney of record.

In conclusion the answer states: " Respondent now realizes that he was hoodwinked by Hacker and feels sad and regretful, and simply places himself at the mercy of this Honorable Court."

By order of this court, dated the 21st day of February, 1929, the matter was referred to a referee to take testimony in regard to the charges contained in the petition and to report the same with his opinion thereon. The referee has duly reported and the petitioners move to confirm his report finding the respondent guilty of misconduct. Upon this motion the respondent has taken the position that the basis of the only charge against him is that he entered into a conspiracy with Hacker to mulct the Union Indemnity Company; that upon that charge the referee has found respondent was not a party to it; that the referee has gone beyond the specifications of the petition and found that while guiltless of that charge, he was guilty of another offense, namely, that of aiding Hacker to derive profit from an illegitimate transaction with which the respondent had nothing to do. Respondent's position is untenable. The petition brought up for review the entire course of his conduct in his dealings with Hacker. The referee was in no way limited to a finding on the charge of conspiracy to defraud the insurance company, which involved but one phase of respondent's conduct.

The record discloses that respondent had known Hacker for some ten years prior to January, 1927; that in January, 1927, Hacker called at respondent's office and had a talk with respondent. Respondent's testimony as to that talk is as follows: " He said to me, he has been dealing with a number of attorneys in settling cases for a consideration. Some attorneys had promised him in certain cases and never paid him. In other words, he stated they flim-flammed him, in his vernacular, so he says — after he says that he called me Morris — after I settle a case I will have you substituted as attorney. I said all right; a few days elapsed, maybe a week probably, and I got a check from the Union Indemnity Company, or a draft made payable to the client or Morris Durst as attorney of record — that is, as an attorney —

" I do not recall which one it is, but one of those Pino cases, and immediately when I received that check I made out a check to the client of 50 per cent and 40 per cent to the attorney — by the way, he promised me 10 per cent to have me substituted as

attorney. He trusted me, he said, I know your check is good, and that is the only way I can get it.

" I inquired of him, ' How are you going to get your money? ' ' That 50 per cent check to the client, I will give it to the attorney. I cannot hold this up, but the check to the attorney I will have him endorse it, and cash it, so as to make sure I will get my money.' So I said all right.

" Q. What did he say about the substitutions? A. He will take care of that. I had no file. He had files representing the Union Indemnity Company, and also knew the attorney. He said he will take care of it, and see the client and the attorney, and get the client and the attorney to sign it, and after that was all done and there elapsed probably a week. I do not recall the time. He brought me a check or draft from the Union Indemnity for $750 made payable to the client or Morris Durst, attorney. When I saw that, I did not inquire about anything else. That was sufficient evidence to me that I was properly substituted. I figured the insurance company is not a child. They are not going to make an order to me for $750, unless I was substituted, so I did not inquire."

Between January, 1927, and February, 1928, respondent testified that there were eight accidents or cases in which Hacker told him he had been substituted and checks were brought to him. These involved fourteen plaintiffs in fourteen actions actually instituted. The first case was that of Greenfield v. Royal Provision Co. It appears that this case was pending in the Municipal Court, Second District of Manhattan, and Mordecai P. Springer, 299 Broadway, was the attorney for the plaintiff. Shortly after making the arrangement with respondent, Hacker brought him a check of the Union Indemnity Company for $450, purporting to be in settlement of this case and payable to the order of the plaintiff " or to Morris Durst, Attorney." This check respondent deposited in his personal account on January 25, 1927. Under date of January 25, 1927 respondent drew his own checks as follows: to the order of Solomon Greenfield, the plaintiff named on the indemnity company check, for $275, being fifty per cent of the amount of the settlement; to the order of Simon Hald, attorney (that being the name given respondent by Hacker as the former attorney of record), for $175, being $5 less than forty per cent of the settlement. Respondent testified that he delivered these checks to Hacker. He retained the balance. The Greenfield case is typical.

In no case was there a substitution of attorney made. In only one case was a check drawn to the order of the original attorney, and he testified he never received the check. In the other cases, not only was no check drawn to the order of the original attorney, but,

with one exception, the check supposed to be for the attorney was drawn to the order of a fictitious person. Respondent testified that he never had occasion to inquire from Hacker as to whether these " attorneys " were real people or fictitious people. He never asked who the attorney of record was. Asked how Hacker was to have him substituted in the case, he replied that the attorney of record was to bring down the client and get him to consent, and the attorney would consent too.

Respondent testified that he never saw any of the plaintiffs; that he had no interest in them. He did not know whether they were actual cases. He figured the attorney of record would take care of that, and he never made any inquiry as to whether they were real cases. It was conceded that the plaintiff in one of these cases would testify, if called, that she never employed respondent to handle her case.

Respondent's testimony indicates that he regarded the arrangement as a plan to discount these checks for Hacker.

The exhibits disclose that of the twenty-one checks drawn by respondent pursuant to directions of Hacker, nineteen were cashed by Hacker personally through the proprietor of a cigar stand in the building in which Hacker's office was located. Concession was made that the only one of the claimants who could be located would testify, if called, that the check issued by respondent payable to her order was not indorsed by her, nor did she receive any part of the proceeds. The referee in his report states, " it may safely be assumed that none of the alleged claimants received the checks drawn to them, or any part of the proceeds."

It appears that in the investigation before Mr. Justice WASSER-VOGEL, respondent testified that by making out his check to the former attorney of record and giving it to Hacker, he enabled the latter to make sure that the former attorney of record would pay Hacker his commission. Referring to this testimony, the referee states: " Did the respondent believe that the former attorneys of record consented to the substitution so that a convenient means would be afforded for holding them up for commissions? I cannot believe that he was so gullible or that these considerations did not suggest themselves to him. Assuming that they did not impress themselves on the respondent's consciousness when first mentioned to him by Hacker, must they not have so impressed themselves as these transactions reoccurred periodically in a period of more than a year? The conclusion that they did so is unavoidable.

" This is borne out by the respondent's course of conduct. He entirely ignored any responsibility with respect to the claimants for whom he assumed to have been substituted as attorney of

record. With full knowledge that Hacker was the representative of an interest adverse to that which he had undertaken to represent, he took Hacker's word for everything except the amount of the settlement and the names of the claimants, both of which appeared on the Indemnity Company checks. He made out the checks to the order of the claimant without attempting to verify the basis upon which the original attorneys of record had been retained, or the basis of division of the proceeds of settlement where the claimants were more than one, or even the fact that the claimants were actually in existence. He accepted the names of the reputed former attorneys of record as dictated by Hacker, without any inquiry as to their existence or confirmation by them of the very remarkable method, to which they were supposed to have assented, of assuring to Hacker indirectly the payments they had refused to him directly. He gave all the checks which he drew to Hacker, and apparently so far as he was concerned considered the incident closed.

" The conclusion is unavoidable, at best, that he realized that he was assisting Hacker in deriving profit from an illegitimate transaction, and at best, that he shut his eyes to the nature and scope of that transaction hoping that by confining his part therein to the receipt of the settlement checks and the disbursements of the proceeds thereof, his connection therewith would be so casual and incidental as to free him, personally, from any moral responsibility for what was being done. Knowing that Hacker was engaged in dishonest transactions and admittedly lending himself to their consummation, he failed to take even the most elementary precautions to assure himself that the purpose of those transactions was as represented to him by Hacker."

As to respondent's illness, pleaded in the answer and urged before the referee, the referee found that this illness (which affected one of his legs) did not interfere with his mental processes. The record satisfactorily establishes respondent's mental alertness.

It is urged that respondent was duped by Hacker, and in support of this Hacker's ability to fool the officials of his employer, the insurance company, and the individual who cashed the checks for him is stressed. There is no question as to Hacker's being the master mind. That in no way excuses respondent's co-operation in the scheme.

Respondent's counsel contends that the proof of respondent's good character should outweigh any inference drawn by the referee from the facts as testified to on the hearing. But this is not a question of inference but of absolute proof of intentional wrongdoing and participation in a fraudulent scheme. As was said

regarding testimony as to character in *Matter of Hawes* (169 App. Div. 644, 648): " Such testimonials have probative value when there is any question upon the evidence as to the guilt of a party accused of misconduct, but do not serve to palliate or excuse proven and intentional wrongdoing."

Respondent deliberately entered into a corrupt and fraudulent scheme and debased his professional capacity to insure its success. His attempted explanation of his actions before the learned referee was palpably false and was properly disbelieved. Respondent is unfit to remain as a member of an honorable profession and should be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.